FILED

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

99 MAR -4  AM 9: 30

U.S. DISTRICT COURT
N.D. OF ALABAMA

**CAROL F. HATCHER,**　　　　　　]

　　　　　　　　　　　　　　　　]

　　Plaintiff(s),　　　　　　　　]

　　　　　　　　　　　　　　　　]

　　vs.　　　　　　　　　　　　]　　CV 97-N-1062-S

　　　　　　　　　　　　　　　　]

**GTE CORPORATION, et al.,**　　]

　　　　　　　　　　　　　　　　]

　　Defendant(s).　　　　　　　]

ENTERED

MAR 0 4 1999

## MEMORANDUM OF OPINION

## I.　INTRODUCTION.

In this employment discrimination case, the plaintiff, Carol F. Hatcher ("Hatcher"), brings suit against her former employer, GTE Corporation and GTE Mobilnet Service Corporation (collectively "GTE"),[1] alleging discrimination on the basis of race and retaliation and seeking a remedy under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981. The matter is presently before the court on the defendants' motion for summary judgment, filed July 31, 1998. The motion has been fully briefed and is ripe for decision. Upon due consideration, it will be granted in part and denied in part.

---

[1] The arrangement of the various defendants shares the complexity common to most large corporations. According to the defendants, GTE was originally licensed in the Birmingham area as Contel Cellular of Birmingham, Inc., which did business as Cellular One. As of January 1, 1996, this entity's license was taken over by GTE Mobilnet of Birmingham, Inc. Plaintiff was actually employed by Contel Cellular, Inc., a service corporation providing services to the licensees. In any event, all of these entities were apparently linked in some way to GTE Corporation, the parent company. The court will not inquire into more detail than this, as the defendants do not at this point dispute the named defendants' liability for the actions plaintiff complains about.



## II.    STATEMENT OF FACTS.[2]

Viewed in the light most favorable to the plaintiff, the record before the court on summary judgment suggests the following version of events. Plaintiff Carol Hatcher, a black female, was hired as a residential sales representative for GTE's Cellular One operation in March of 1994. During this time she worked for a black supervisor, Gary Mason. She apparently performed well in her post and was promoted into the job of commercial accounts executive (CAE) in August of 1994. Plaintiff claims that, compared to whites, she had a more difficult time getting the job. According to plaintiff, she had to go through more interviews than other applicants and was passed over once in favor of a less qualified white employee. She provides no more details than this. Both before and after her promotion, plaintiff apparently had discussions with a number of black employees, including Mason, in which they shared their observations that there were not many black employees in management, that it was hard for blacks to get ahead in the company, and that racism was present in the company.

When plaintiff originally assumed her post as a CAE, she was under the supervision of Johnny Scruggs. Plaintiff claims that during her tenure under Scruggs's supervision she was not trained as effectively as white employees. In particular, she was not sent to the mandatory training program as early as many white employees, and unlike white employees was not paired with experienced CAE's for informal training and was not coached on ride-

---

[2] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

alongs by her supervisor.  There is some dispute about when the right time for Hatcher to attend her course was, and the extent to which other employees were given additional training opportunities, among other issues.  Whatever her relative level of training, however, Hatcher performed fairly well as a CAE, at least initially.

Mr. Scruggs left the company in January of 1995 and, for a time, the team leader of the other CAE team handled Hatcher's team as well.  In several memos she instituted fairly strict policies about the handling of cash transactions  and the assignment of customers to the proper rate plans.[3]  However, she apparently was fairly lenient in her enforcement techniques, relying on conversations and sticky notes to point out problems.  Hatcher claims that equal training opportunities were still not made available to her, but she continued to perform satisfactorily.

At about this time, Hatcher allegedly[4] applied for a promotion to a new Data Sales Engineering (DSE) position specializing in the sale of cellular systems for fax and internet connections.  The position requirements included a B.S. or B.A. degree in marketing or equivalent work experience, coupled with one to three years of experience selling data, telecommunications or network services.  The company disputes whether Hatcher was

---

[3] As the rate plans and cash handling policies play a part in the ultimate *denouement* of this story, the court will say a word about them here.  Cellular One has different rate plans available depending on the circumstances of the particular customer.  These vary depending on the number of lines bought, whether an established business is paying the bills, and so forth.  Billing is also variable and the options range from services provided on heavy credit to a pay-as-you-go system (Pay-Go) for people who cannot qualify for credit.  In Pay-Go cases, the CAE's collected cash payments.  The company wanted any cash collected to be turned over quickly, so the managers of the CAE's in Birmingham imposed their own eight business hour time limit, referred to hereinafter as the "eight hour rule."  There were also promotions available to customers who met particular requirements.  Naturally, the company wanted the right customers assigned to the right plans and enacted rules to ensure that its salespeople applied each plan's requirements correctly.

[4] Defendants are not sure she did, and there is apparently no written record.  Nevertheless she claims she did, which is sufficient for summary judgment purposes.

even qualified for the position, as she had several years of work in customer service and sales for technical companies but her educational qualifications include only an Associate's Degree in computer science. Hatcher had also served in her CAE position for less than a year, and the company's policies require a year of service in a position before an employee is eligible for promotion

Ultimately the DSE position in Birmingham[5] was given to Kevin Massata, a Cellular One employee with a B.S. in marketing from Penn State and four years of experience with the company in various sales and management positions. He was hired in June of 1995.

Meanwhile, in April of 1995 Kay Lucas took over Scruggs's old position as the plaintiff's manager.[6] Hatcher and Lucas soon came into conflict. Lucas wrote a number of memos to Hatcher detailing problems with Hatcher's cash management and handling of the company's rate plans. Hatcher's productivity also declined, which she attributes to Lucas's constant nagging about paperwork, and a resulting increase in the amount of time Hatcher spent on paperwork and decrease in the amount of time she could spend drumming up business. Whatever the reason, Hatcher's output fell below quota significantly and Lucas wrote her memos about this as well.

---

[5] Plaintiff also claims she was discriminatorily denied the same position in Tampa. However, it appears that she never actually applied for this position and in fact indicated that she did not want to move to Tampa.

[6] Plaintiff spends a fair amount of time in her brief arguing that the overall manager in Birmingham manipulated the selection process in order to pick Lucas, a white woman, over plaintiff's mentor and former manager Mason. This claim formed the basis of another lawsuit by Mason, and it is not clear exactly how that case relates to this one. Plaintiff argues, perhaps correctly, that it constitutes evidence of racial animus and pretext. She also suggests that Mason's suit, and the company's knowledge of their friendship, might have made the company hypersensitive to her own claim of racism, and thus perhaps more inclined to retaliate against her.

4

For her part, the plaintiff was not thrilled with Lucas's performance as manager either. She has voiced several complaints about Lucas. She complains about Lucas's management style, and contrasts this with the more *laissez faire* approach of Scruggs and the interim manager. More ominously, the plaintiff claims that Lucas's strict enforcement of the rules and frequent warning memos were directed at her alone, for racist reasons. Specifically, the plaintiff alleges that Lucas dealt with white employees via informal comments and suggestions, rather than the harassing memos she sent to the plaintiff.

The plaintiff can not recite details to support this impression. However, during a June 19, 1995 meeting to discuss her performance problems, the plaintiff told Lucas that she felt she was receiving the memos, and was subject to stricter scrutiny, because she was black.[7] Hatcher also testified that some time after this meeting she called the company's human resources department and complained about the treatment she had been getting, though she was hazy on whether race discrimination was mentioned specifically.

The plaintiff also claims that her poor performance was caused in part by the lack of support she got from Lucas. According to Hatcher, Lucas continued the prior managers' practices of failing to provide her with training and suggestions, unlike the white employees, and that Lucas provided marketing suggestions and referrals to the white

---

[7] For example, Lucas's reprimands frequently involved Hatcher's violation of the eight hour rule, see *supra* note 4. Lucas has admitted that other employees violated the eight hour rule. She says she dealt with the violations differently depending on the circumstances, and particularly depending on whether the same employee had violated the rule repeatedly. Neither Hatcher nor Lucas can remember the details of any specific instances in which another employee violated the eight hour rule.

employees and not to the plaintiff.[8]  As already noted, Hatcher also alleges that the strict paperwork regimen Lucas forced her into took much needed time away from actual sales.

For whatever reason, the plaintiff's performance did decline and, by the middle of June, 1995, was deficient enough to warrant probation. After the June 19 meeting in which Hatcher alleged discrimination, Lucas issued a memo in which she announced that she would give Hatcher "the benefit of the doubt" and not place her on probation, but also set out new and more stringent requirements[9] for Hatcher to help her get "back on track."  By July 20, Hatcher's numbers were still not up to quota.  Also, Hatcher had apparently misapplied the rate plans for a number of customers, resulting in her not getting sales credit for these customers and increasing the gap between her production and the expected sales. Lucas drafted a memo placing Hatcher on probation for failing to reach performance goals, but never sent it.  Instead, on July 24 Lucas sent out another memo pointing out problems with the handling of several of Hatcher's accounts.

Then, on July 31, Lucas placed Hatcher on a Performance Improvement Plan (essentially probation) for failure to comply with the cash handling policy instituted by the Birmingham managers.  Under the plan, Hatcher was again subjected to more stringent

---

[8] For example, Hatcher claims that both her interim supervisor and Lucas referred lucrative accounts she was working on to white employees. In one situation, she alleges that a customer services officer told her the account was referred based on race. *See Hatcher Depo.*, Vol. II at 196-210. She is somewhat fuzzy on the details. However, it is not clear whether this occurred before or after April 23, 1995. It is also not clear whether referrals of this type were a common practice. Defendants claim that the customer services office made referrals to all CAE's. According to defendants, the referrals sometimes involved the accounts of other CAE's because customer service does not always know who is working which accounts. Hatcher alleges that she was not given the same referral opportunities as other white employees.

[9] These included fixed amounts of time in the office, increased calls and reports to Lucas, and an admonition to follow company protocols precisely.

requirements, this time involving cash handling and regular reports to Lucas. Hatcher apparently refused to sign the plan document, stating that she needed to talk to her lawyer first.

On August 13, Lucas drafted a "final warning" memorandum to Hatcher stating that cash payments had not been turned in from a number of accounts, pointing out that she was already on probation for cash handling problems, and stating that the problems must be fixed in thirty days or Hatcher would be terminated. This memo was never sent either, and bears a notation from Velda Kramer, the company's local Human Resources officer, indicating that she needed more information before the memo could be released. Apparently, Lucas then wrote to several of the customers whose accounts were listed as unpaid in the August 13 memo. Some wrote back to indicate that they had paid Hatcher in cash several days previously. Hatcher had not yet turned this cash in to the company, an apparent violation of Lucas's cash handling rules.[10] Plaintiff was terminated on August 31, 1998.[11] The decision was apparently made by Lucas, Lucas's boss, and Kramer, the human resources officer. According to Lucas, plaintiff was fired for violations of the cash handling policy and the terms of her probation "plan." However, no letter explaining the reasons for the plaintiff's termination was ever sent to her.

---

[10]Specifically, Hatcher allegedly violated the eight hour rule by failing to turn the cash over to the company in a timely manner. However, as to some of these customers, there is apparently a disagreement over whether eight *business* hours had gone by. Lucas contends that her improvement plan for Hatcher in fact changed the requirement to eight hours, business or not, to encourage her to turn cash over quickly.

[11]The court notes that this was a month after Hatcher was placed on probation. The plaintiff claims that the company had a policy that probation plans should last at least sixty days before the employee could be terminated. Defendant disputes this point. Although plaintiff's brief claims there was a "written" policy, the court can not locate such a document anywhere in the submissions, and plaintiff cites to none.

## III.   SUMMARY JUDGMENT STANDARD.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Where the nonmoving party will bear the burden of proof at trial, there is no requirement, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323. "Instead, the moving party simply may '"show[ ]"'--that is, point[ ] out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir.1991) (*en banc*) (quoting *Celotex*, 477 U.S. at 324); *see also Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (same); *Young v. City of Augusta*, 59 F.3d 1160, 1170 (11th Cir. 1995). However, "it is never enough simply to state that the non-moving party can not meet its burden at trial." *Clark v. Coats and Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party must instead make an "affirmative showing" that crucial evidence is missing "by reference to any combination of the following: pleadings; deposition testimony of a party or its witnesses; affidavits;

8

responses to interrogatories . . . ; requests for admission . . . ; and any other exchanges between the parties that are in the record." *Cheatwood v. Roanoke Industries*, 891 F. Supp. 1528, 1533 (N.D. Ala. 1995) (Hancock, J.).

"Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.  If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Four Parcels of Real Property*, 941 F.2d at 1437-38 (11th Cir.1991).

At this stage, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. *Id.* at 324.  The nonmoving party must make a specific, affirmative showing that a genuine factual dispute exists.  If the required showing is not made, "summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

After the plaintiff has responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from

10

the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. THE MCDONNELL DOUGLAS FRAMEWORK.

This case involves the application of Title VII of the Civil Rights Act to claims of racial discrimination and retaliation. Plaintiff has presented only circumstantial evidence of discrimination, so the familiar framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), governs this court's inquiry.[12] Claims under 42 U.S.C. § 1981 are governed by the same standard, so the court will merge the analysis of these claims and those brought under Title VII.

Under the *McDonnell Douglas* framework, a plaintiff seeking to establish a claim based on circumstantial evidence first must bear the burden of establishing a *prima facie* case of discrimination or retaliation. "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring the defendant to articulate some "legitimate, nondiscriminatory reason" for the allegedly discriminatory employment action. *Id.* "[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale

---

[12] Plaintiff has not offered any direct evidence of discrimination. She did assert a pattern and practice claim, but ignored it in her brief. Additionally, she has presented no statistical evidence, making only generalized claims of differential treatment. The plaintiff has therefore waived any claim not based on circumstantial evidence, and summary judgment is due to be granted on such claims.

11

that summary judgment is warranted." *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metal Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then prove by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original).

The plaintiff may prove that the defendant intentionally discriminated against her "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). However, "'to withstand a defendant's motion for summary judgment, a plaintiff has to do more than establish a prima facie case and deny the credibility of defendant's witnesses.'" *Howard v. BP Oil Co.*, 32 F.3d 520 (11th Cir. 1994) (quoting *Brown*, 939 F.2d at 950). "Conclusory allegations of discrimination, without more, are not sufficient to raise an

inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions." *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). Plaintiff must instead "produc[e] sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable."[13] *Howard*, 32 F.3d at 526.

If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997). Because of the difficult factual questions involved in assessing "an employer's true motivations," once the plaintiff has presented evidence raising a question about those motivations, summary judgment is ordinarily inappropriate. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If evidence in the record "demonstrate[s] 'such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's preferred legitimate reasons for its action that a legitimate factfinder could find them unworthy of credence,'" the final assessment of the employer's motivation must be left to the jury. *Combs*, 106 F.3d at 1538.

---

[13] In other words, a defendant can carry its initial burden on summary judgment on the pretext issue by presenting extensive proof to support its legitimate nondiscriminatory reason. If the defendant can show that its preferred reason was the real reason, it need not prove a negative by showing that the plaintiff can not prove pretext. Pretext and a legitimate reason are, after all, two sides of the same coin. Proof of one disproves the other.

## V.   DISCUSSION.

### A.   Timeliness.

As a threshold matter, defendants seek to limit the adverse actions Ms. Hatcher can base her claims upon because some of the actions complained of were not raised in a timely EEOC charge. Title VII requires that an employee file an EEOC charge within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e-5; *Welty v. S.F. & G., Inc.*, 605 F. Supp. 1548, 1553 (N.D. Ala. 1985). Therefore, a Title VII claim can not be based on discriminatory actions taken more than 180 days before the EEOC charge was filed. The plaintiff filed her EEOC charge on January 23, 1996, making Title VII claims based on any action taken before July 27, 1995 untimely.   The statute of limitations under 42 U.S.C. § 1981 is two years, so only claims based on actions on or after April 23, 1995 are timely.   As plaintiff essentially conceded in her brief, *see Opponent's Responsive Submission in Response to Exhibit D*, at 5, actions prior to this date therefore can not form the basis of a claim in this lawsuit.

Plaintiff contends, however, that despite the time bar, evidence of past acts can be used to prove present discrimination.   Plaintiff may be correct, but only to a point.   The Eleventh Circuit has indicated that, while such evidence can be used to prove pretext, a plaintiff can "not use time-barred evidence of allegedly discriminatory . . . practices in order to establish a prima facie case." *Turlington v. Atlanta Gas and Light Co.*, 135 F.3d 1428, 1434, 1436 (11th Cir. 1998).   Thus, at least in most cases,[14] a plaintiff must come forward with

---

[14] While *Turlington* is not clear on this point, there may be some exception to this general rule.  For example, past discriminatory acts by a particular supervisor which "set the stage" for a timely challenged act by the same supervisor *might* be so closely tied together that the earlier acts can be used as background evidence

a fresh, timely *prima facie* case before introducing evidence of past acts. This is entirely consistent with the Supreme Court's instruction that a time-barred act "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." *United Airlines v. Evans*, 431 U.S. 553, 558 (1983). Thus plaintiff's time-barred evidence may bear on the pretext question, but can not be used to prove her *prima facie* case.

## B.  Racial Discrimination.

Title VII of the Civil Rights Act provides, in part, that it is unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). In order to prevail on a claim of race discrimination under Title VII, the plaintiff must prove that the defendants acted with a discriminatory purpose,[15] and that this purpose affected the terms and conditions of her employment. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). To make out her *prima facie* case Ms. Hatcher must first

---

to show the problem with the later one. When a supervisor discriminatorily disciplines an employee, *Turlington's* rule may not allow the employer to claim that a *prima facie* case based on the same supervisor's later decision to fire the employee could not be made out because other employees had not been disciplined. Courts thus might recognize an exception, similar in principle to the continuing violation rule, in such circumstances. However, plaintiff has not argued for any such exception, and so is not entitled to one. In any event the court doubts that an exception of this type would apply in this case. Acts by one supervisor, for example Scruggs's failure to train, probably can not be used to raise the needed *prima facie* inference of discrimination by a completely different supervisor, such as Lucas. Allowing such use of time-barred acts would eviscerate *Turlington's* rule. Because Lucas took over supervision of the plaintiff's group just before the time limit on plaintiff's claims, past acts by past supervisors have no relevance in establishing a *prima facie* case of discrimination based on her allegedly wrongful acts.

[15]Where an entity like GTE is concerned, this means that an agent of GTE acted with discriminatory intent under circumstances in which GTE can be held responsible for that agent's conduct.

identify specific actions by GTE which affected the terms and conditions of her employment, and then match these actions with "facts adequate to permit an inference of discrimination." *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). What these facts are depends on the circumstances, so that the *prima facie* case concept is flexible and the elements may vary slightly from case to case. Generally, however, to make out a claim of race discrimination, the plaintiff must show that she was not treated in the same way as other employees of different races.[16]

In this case, Ms. Hatcher asserts that GTE discriminated against her in a number of ways. While many of her claims are time-barred, she alleges timely claims for: 1) discriminatory failure to train (though most of the failure to train incidents are time-barred); 2) discriminatory referral and assignment of accounts; 3) discriminatory discipline for Lucas's memos; 4) discriminatory failure to promote to the data systems engineer post; 5) discriminatory termination; and 6) retaliatory termination. All of these claims except the last one share one fatal flaw -- Ms. Harris can not make out her *prima facie* case.

### 1.    Race discrimination in training and referrals.

Plaintiff's claims of racially discriminatory training and referrals are governed by the same basic *prima facie* case requirements which govern all circumstantial evidence claims.

---

[16]The court recognizes that there may be limited circumstances in which a discrimination *prima facie* case can be made in some other fashion, by the accumulated weight of circumstantial evidence rather than by comparison to the treatment of other employees. *See, e.g., Benson v. Tocco, Inc.*, 113 F.3d 1203, 1208 (11th Cir.1997); *Alphin v. Sears, Roebuck, & Co.*, 940 F.2d 1497, 1501 (11th Cir. 1991); *Pace v. Southern Railway Systems*, 701 F.2d 1383 (11th Cir. 1983). However, courts apply such "quasi-McDonnell Douglas test[s]," *Alphin*, 940 F.2d at 1501, principally in unusual cases in which a comparison-based *prima facie* case by its nature cannot function. There is no evidence in this case to suggest that suitable comparators would not exist if discrimination were present. Plaintiff simply has not come forward with any. This is not reason enough to abandon the usual *prima facie* standard. In any event, plaintiff has not argued for any approach other than the ordinary *McDonnell Douglas* test, so the court will consider plaintiff's race claims only under this standard.

Thus "[t]o establish a prima facie case of failure to train plaintiff must demonstrate that 'she is a member of a protected class, that . . . she is otherwise similarly situated to members of the unprotected class, and that he or she was treated differently from members of the unprotected class.'" *Williams v. HMO of Florida*, 689 F. Supp. 1082, 1089 (M.D. Fla. 1988) (quoting *Ramsey v. American Air Filter Company, Inc.*, 772 F.2d 1303 (7th Cir.1985)). The same standard applies to plaintiff's referral claims.

Plaintiff's claims are plagued, however, by a striking lack of detail relating to the alleged problems occurring after April 23, 1995. Plaintiff might be able to make out a *prima facie* case based on incidents prior to this time. For example, there is some dispute about whether plaintiff was offered GTE's training course as fast as white employees hired soon after her. Likewise, plaintiff at least alleges that an employee from another department informed her that a lucrative account had been assigned to another CAE because of race.[17] The problem is that most of this activity went on before April 23, 1995, and so is time barred. While Hatcher testified that the same problems went on under Lucas's supervision, she has not been able to detail any specific instances after that date.[18] Her general allegations do not point to a similarly situated employee and so do not meet the general *prima facie* requirements. Thus the plaintiff can not sustain a *prima facie* case as to these claims. At

---

[17] Because this testimony does not constitute direct evidence, even if the referral involved had occurred after the time bar date Ms. Hatcher would have had to come forward with a *prima facie* case before stating a claim on this basis. As discussed below, she has not.

[18] While plaintiff's factual submissions contend that her deposition established some of these violations as incurring after Lucas arrived, *see Depo. of Carol Hatcher,* Vol. II., at 224-226, the cited deposition pages in fact refer only to previous supervisors, and so do not establish the facts claimed.

best, these incidents are evidence of pretext and racial animus to support other, timely claims.

## 2.    Race discrimination in discipline and termination.

To prevail on her claims of discriminatory discipline and termination, Ms. Hatcher must prove that similarly situated employees guilty of equivalent offenses were treated less harshly.[19] *Holifield v. Reno*, 115 F.3d 1555, 1555 (11th Cir. 1997). In other words, to prove her *prima facie* case the plaintiff must show: 1) she belongs to a racial minority; 2) she was qualified to do the job; 3) she was subjected to adverse job action; and 4) her employer treated similarly situated employees more favorably. *Id.* at 1555. The Eleventh Circuit has indicated that establishing the crucial fourth element of this test requires a fairly tight fit between the allegedly wrongful acts of the plaintiff and those of the "similarly situated" comparators. "[I]t is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1311 (11th Cir. 1998). Likewise, the comparators must have a relatively similar disciplinary history. *See id.*

While Ms. Hatcher alleges in a general sense that other employees were guilty of the same violations and did not receive similarly harsh treatment, she has not come up with any specific examples. She certainly has not pointed to white employees with similar histories of repeated problems who were treated differently. Employee discipline is simply too context-sensitive to allow a *prima facie* case to be built on nameless, faceless, comparators

---

[19]Ms. Hatcher might also be able to make out a *prima facie* discriminatory termination claim by showing that she was terminated and replaced by someone outside of her protected class. *See, e.g., Nix*, 738 F.2d at 1185. She has not attempted to do so.

18

or generalized allegations. Therefore, as defendants have pointed out, plaintiff can not make out her case because no evidence in the record establishes the comparison between her circumstances and those of other employees in sufficient detail to satisfy the *prima facie* requirements.

Despite this flaw in her case, plaintiff contends that she has substantial evidence of pretext, and that summary judgment is therefore not proper. However, circumstantial evidence of pretext is meaningless if plaintiff can not step across the threshold of the *prima facie* case. Summary judgment will therefore be granted as to the plaintiff's claims of racially discriminatory discipline and termination.

### 3.    Discriminatory failure to promote.

A *prima facie* failure to promote case requires the plaintiff to show that "(1) the plaintiff is a member of a protected minority group;  (2) the plaintiff was qualified for and applied for the promotion;  (3) the plaintiff was rejected in spite of h[er] qualifications;  and (4) the individual who received the promotion is not a member of a protected group and had lesser or equal qualifications." *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) (citing *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988)). The court has cautioned that subjective differences in qualifications should not be relied on to bar a claim, at least at the *prima facie* stage, and has read the qualifications listed by the employer fairly liberally in the plaintiff's favor at this stage as well, *id.* at 643-44. However, a clear difference in objective qualifications is still sufficient to negate a *prima facie* case.

19

In this case, it is quite clear that the white employee who was eventually given the data systems post was more qualified than Hatcher in almost every respect. Mr. Mazzata had the degree required by the job specifications, had several years more experience with the company, and had experience in higher level sales and marketing jobs. Thus plaintiff can make out a *prima facie* case only if the qualifications are bent considerably.[20] The court sees no justification for doing so, and therefore concludes that the plaintiff can not make out her *prima facie* case.[21]   Summary judgment will therefore be granted as to plaintiff's promotion claim as well.

### B.   Retaliation Claim.

The defendants also seek summary judgment on the plaintiff's retaliation claim based upon their contentions that she can not sustain her *prima facie* case or prove pretext. In order to make out a prima facie case of retaliation, Ms. Hatcher must show (1) that she was engaged in statutorily protected expression, (2) that the defendants took adverse employment action against her, and (3) a causal link between the protected expression and the adverse action. *Lindsey v. Mississippi Research and Dev. Ctr.*, 652 F.2d 488, 491 (5th

---

[20] Defendants argue, in fact, that she was not qualified at all. To the extent that argument is based on the company's one year policy for promotions, they may be correct. However, defendants also claim that Hatcher's experience is not the equivalent of a marketing degree because the qualifications also require one to three years of sales experience, and any "equivalent" experience has to be added on to this. While this is a plausible reading of the qualifications, it is certainly not a required one. Its just not clear what "equivalent" experience is, so at this stage the court assumes that Hatcher qualifies under this standard. *See Carter*, 132 F.3d at 643 ("The drafters of the job description may have intended something more, but shoddy drafting does not give an employer license to redefine job requirements on the fly in an attempt to win summary judgment. [Defendants] can argue to the trier of fact that '[equivalent] experience' means something more."). However, given the court's disposition of the remaining issues, it need reach no final conclusion on this issue.

[21] Even if this were not the case, Mr. Mazzata's superior qualifications form such a powerful justification for the defendants' choice that the court suspects that summary judgment would be due on the pretext issue as well.

Cir. 1981). The defendants argue that Ms. Hatcher can not establish either the first or the third elements of her retaliation claim. They concede that they took adverse action against her.

Title VII makes it unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a). The protection of this so-called "opposition clause" reaches beyond formal complaints to the EEOC. Protected activities include even informal complaints to an employer about allegedly discriminatory activities. *See Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). Defendants contend that Ms. Hatcher never took action sufficient to trigger the protection of the clause.

The plaintiff bases her retaliation claims in part on two discussions with her supervisor, Lucas. During one meeting, the plaintiff allegedly indicated that she felt that Lucas was disciplining her more severely than white employees for similar violations, and that the reason was race. In another, she indicated to Lucas that she would not sign a document without consulting her attorney, which admittedly suggested to Lucas the possibility that a discrimination suit might be forthcoming. In the court's view, these discussions were sufficient to trigger the protections of Title VII's opposition clause. They conveyed to an agent of the defendants the clear message that Hatcher felt discriminated against, and indicated why.

Defendants offer twin objections to the plaintiff's alleged protected activity. They argue that the plaintiff's suggestions of discrimination were brief and vague and, relatedly,

21

that they had no actual basis in fact. The court believes it important to distinguish between these two objections, and will attempt to do so.

It is true that not every complaint about racial bias is covered by Title VII's opposition clause. The complaint must relate to a "practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). "'[B]y the terms of the statute . . . not every act by an employee in opposition to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer.'" *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997) (quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)). Eleventh Circuit precedent establishes a relatively high standard for the plaintiff to meet in this regard. Thus

> a plaintiff can establish a prima facie case of retaliation under the opposition clause of Title VII if he shows that he had a good faith, reasonable belief that the employer engaged in unlawful employment practices. It is critical to emphasize that a plaintiff's burden under this standard has both a subjective and an objective component. A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997). Furthermore, the belief that this conduct was actually unlawful under Title VII must be reasonable in the eyes of an objective observer "charge[d] . . . with substantive knowledge of the law." *Harper v. Blockbuster Entertainment Corp.*, 139 F.3d 1385, 1388 n.2 (11th Cir. 1998); *see Clover v. Total Systems Servs.*, 157 F.3d 824 (11th Cir. 1998).

22

On the other hand, plaintiff's objectively reasonable belief can be conveyed to the employer in virtually any form. *See Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989). What is important is simply that the employer gets the message. The causation prong of the Eleventh Circuit's *prima facie* case requires "at least . . . that the employer was actually aware of the protected expression at the time the employer took adverse employment action against the plaintiff." *Holifield v. Reno*, 115 F.3d 1555, 1566 (11th Cir. 1997). While the Eleventh Circuit has never spoken directly on the point, the court suspects that "implicit in the requirement that the employer have been aware of the protected activity" and in *Little*'s logic "is the requirement that [the employer] understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998). However, if the employer can understand, nothing further is or should be expected of the employee. Title VII does not leave an employee who makes a real complaint about possible discrimination unprotected merely because the complaint is vague. In determining protection under the opposition clause, the real questions are whether the complaint was in fact directed against a particular unlawful practice, and whether it could reasonably be understood by the employer that way. If so, the Eleventh Circuit's requirements are satisfied. Linguistic precision is not and should not be required.

In the court's view, a jury could easily infer from the record evidence that Hatcher had made her point quite clear. She indicated concern over a specific situation -- discriminatory discipline -- to Lucas. More significantly, she emphasized this concern by

later suggesting to Lucas that she had a lawyer with whom she needed to consult about the situation. A reasonable person could interpret such a remark in only one way, especially given Hatcher's prior complaints about racism. It suggests a possible lawsuit. *See Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (circumstantial evidence can be used to show defendant's knowledge of a protected activity). The threat of legal action should be more than enough to constitute protected activity. *See id.* at 1157, 1162-63 (plaintiff who advised a city representative that "she planned to consult an attorney about the possibility of filing charges" engaged in protected activity). Therefore the court does not share defendants' concern over the allegedly vague and informal nature of plaintiff's complaints.

As already noted, however, the Eleventh Circuit imposes relatively stringent objective and subjective requirements on the plaintiff's belief that discrimination had occurred. Defendants argue that the plaintiff can not meet these tests. However, the record does at least suggest that Lucas disciplined the plaintiff in different ways than she did other employees. As a legal matter, this clearly would amount to discrimination if race was the reason. Furthermore, while the specific evidence in the record is not sufficient to meet the precise requirements of a *prima facie* case of discriminatory discipline, the court can not say for sure that Hatcher did not have enough general information to at least suspect discrimination. The resolution of this question turns largely on what the plaintiff actually knew, an issue which has not been fully developed by either party. Thus while the court is not sure whether, when all the facts are in, the plaintiff will be able to meet the Eleventh Circuit's standard, at this point defendants have not proven that she can not. The

24

defendants have failed to carry their initial burden on this issue, so for the time being the protected activity prong is not fatal to plaintiff's *prima facie* case.

To satisfy the third, causation element of her prima facie case of retaliation, Ms. Hatcher must show a causal connection between the protected expression and the adverse employment action. In the Eleventh Circuit, this requirement is interpreted broadly; "a plaintiff merely has to prove the protected activity and the negative employment action are not completely unrelated." *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1991).

Ms. Hatcher relies largely on the proximity in time between her complaint and her termination to indicate a causal relationship.  However, this may well be enough.  The timing of an action alone may be almost sufficient to satisfy the causation standard. *See id.* at 1572 ("the cumulative effect of these actions and their timing . . . was sufficient to meet the plaintiff's initial burden.");  *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1164 (11th Cir. 1993) ("[E]vidence that [the] employer knew of employee's protected activities, *combined with a proximity in time between protected action and the allegedly retaliatory action*, is sufficient to establish a prima facie case of retaliation.") (citing *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)) (emphasis added); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 600-01 (11th Cir. 1986).  On the other hand, as Judge Propst of this court has pointed out, "the expiration of a short time alone can create an inference of a causal link" only if "there [is] no . . . intervening factor between the charge of discrimination and discharge." *Booth v. Birmingham News*, 704 F. Supp. 213, 215 (N.D. Ala. 1988).  The presence of an intervening

event breaks the causal chain and dissipates the inference of discrimination. Defendants contend that just such an event occurred, barring plaintiff's *prima facie* case of retaliation.

The parties' argument regarding this question centers on the exact timing of plaintiff's complaint and termination, so the court will review these facts in slightly more detail. Ms. Hatcher first mentioned possible discrimination to Lucas during a meeting on June 19, 1995, and on July 31, Lucas placed Hatcher on the probationary "plan" - it was during this meeting that Hatcher referred to her lawyer. On August 31, Hatcher was terminated. In the interim between the July 31st meeting and Hatcher's termination, Lucas had learned that Hatcher was still late in turning in cash on several accounts, and had written to the customers and received confirmation that Hatcher had already received the money from them but had not yet turned it in to the company. Defendants contend that this "intervening" discovery is sufficient to overcome any inference of retaliation based on timing alone.

This court disagrees. This information does not appear to be "new" or "intervening" at all. The conduct in question was no different from what Hatcher had been doing before, and what had prompted the probation in the first place. While it certainly might be an appropriate ground for firing Hatcher, it was not new in any real sense. The fact that an ongoing problem continued simply does not show that Lucas chose the particular time she did to fire Hatcher based on something besides retaliatory motives.

Customer confirmation of the cash collection problem was a new development, but it hardly fell in Lucas's lap. She pursued this information, and it could thus be viewed as part of a retaliation campaign. In fact, a jury could easily view Lucas's investigation of the

26

matter as evidence supporting retaliation, and could infer that the company wanted to fire Hatcher but, to get around her lawsuit, wanted a documented reason for doing so. This fairly reasonable inference would make the timing of action and reaction even closer. Given the close timing, including the fact that Lucas may have been taking steps towards firing Hatcher a few weeks after she mentioned an attorney, the court concludes that Hatcher can show the minimal causal connection the Eleventh Circuit requires, and so can prove her *prima facie* case.

While Hatcher undisputedly failed to follow Lucas's policies, giving the company a legitimate nondiscriminatory reason for firing her, the plaintiff can also offer sufficient evidence of pretext to avoid summary judgment. As already discussed, the plaintiff can not prove specifically that a particular "similarly situated" employee was given more leeway about the cash-handling rules than she was. However, there is evidence to indicate generally that Lucas did not always pursue this matter as formally or as rigidly with other employees as she did with Hatcher. Lucas's switch of focus from missed quotas to the cash handling policy after Hatcher mentioned race in their June 19 meeting is also suggestive, as is the fact that Lucas has apparently testified in other proceedings that Hatcher was in fact fired for missed quotas, testimony that conflicts with her testimony here.[22] *See, e.g., Starks v. George Court Co.*, 937 F.2d 311, 314 (7th Cir. 1983) (inconsistencies in the testimony of defendant, along with other evidence of racial animus, sufficient to support finding that defendant's explanation was unworthy of credence). Probative also are plaintiff's numerous other claims of unequal treatment, which, although insufficient in

---

[22]Of course, as the defendant points out this alone is not enough to prove pretext.

27

themselves to support a claim, do at least suggest that Lucas and the company may not have taken an entirely evenhanded approach towards Hatcher. Particularly in light of Lucas's active pursuit of violations to charge Hatcher with, this evidence is enough to raise a factual issue for trial about whether the cash handling policy was the real reason for discharge.

The court recognizes that Hatcher has fairly limited evidence of actual racial motivation. However, merely proving pretext is enough to entitle her to trial in the Eleventh Circuit. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997). Therefore the court concludes that the defendant has failed to carry its burden of negating the elements of plaintiffs retaliation claim, and summary judgment is due to be denied as to the plaintiff's retaliation claim.

## V.   CONCLUSION.

The defendants' motion for summary judgment will be granted in part and denied in part. The court will enter an appropriate order in conformity with this memorandum opinion.

Done, this ____4th____ day of March, 1999.

_____
EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE